# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3368-16T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

M.J.,

     Defendant,

and

L.M.,

     Defendant-Appellant.

_____

IN THE MATTER OF N.S.M.
and N.N.M.,

     Minors.

_____

Submitted April 23, 2018 – Decided March 12, 2019

Before Judges Accurso and O'Connor.

On appeal from Superior Court of New Jersey,
Chancery Division, Family Part, Hudson County,
Docket No. FN-09-0380-13.

Joseph E. Krakora, Public Defender, attorney for
appellant (Fabiola E. Ruiz-Doolan, Designated
Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for
respondent (Jason W. Rockwell, Assistant Attorney
General, of counsel; Monique D'Errico, Deputy
Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian,
attorney for minors (Caitlin A. McLaughlin,
Designated Counsel, on the brief).

The opinion of the court was delivered by

O'CONNOR, J.A.D.

In this Title 9 matter, defendant L.M. (father) appeals from the January 8, 2014 Family Part order that was entered at the conclusion of a fact-finding hearing. The order states the father abused or neglected his two children, N.S.M. (Nate) and N.N.M. (Natalie).[1] For the reasons that follow, we affirm.

---

[1] We use initials and pseudonyms to protect the identity of the parties. For consistency, we use the same pseudonyms employed by the parties in their respective briefs.

## I

We summarize the pertinent evidence adduced during the fact-finding hearing. Natalie was six and Nate seven years of age at the time of the subject incident, which occurred in their home during the evening of March 20, 2013. At that time, the children were living with their father and M.J. (mother). The day after the incident, Tiffany Meredith, a Division of Child Protection and Permanency (Division) investigator, interviewed the father, the mother, and the two children.

The investigator's interview of the mother revealed the following. Although the investigator wanted to speak with the mother in private, the mother insisted the father be present so he could hear what she had to say. The mother informed the worker that, the night before, the father became intoxicated and choked her. The investigator testified she saw red marks on the mother's neck, which the mother attributed to being choked. During the mother's interview, the father interjected and stated he did not choke the mother but merely grabbed her by the neck. He claimed he did so because the mother had punched him.

The investigator separately interviewed the father and he reported the following. At one point during the previous evening, the mother discovered

the father was going to go out and meet with friends and she "started going crazy." The father reported the couple argued and the mother "got into [the father's] face." He in turn responded by grabbing her by her collar, pushing her away, and leaving the house. The mother followed him out of the door and punched him in the face. The father also reported that the mother got the children "involved" by telling Nate to call the police. The father claimed neither child was harmed during the incident.

The investigator spoke to Nate in private. Nate stated that during the incident, he saw his father push a chair at his mother, get on top of her, and choke her. Nate became frightened and dialed 9-1-1, but the telephone did not work. Therefore, he and Natalie attempted to pull their father off of their mother and, during the course of doing so, their father hit Natalie. Their father then left the house.

Nate stated he saw bruises around his mother's neck and claimed Natalie had a bruise as well, but he did not state specifically where the bruise was located on his sister's body. The investigator testified she did not see any bruises on Natalie.

A-3368-16T4

Natalie told the investigator that her parents argued at times, but she had never witnessed them hit each other. When asked if her parents had argued the night before, Natalie responded in the negative and changed the subject.

As a result of its investigation into the subject incident, the Division filed a verified complaint seeking the care and supervision of Nate and Natalie. No other evidence relevant to the issues on appeal was introduced; both parents declined to testify.

At the conclusion of the fact-finding hearing, the Division argued the father placed the children at substantial risk of harm as defined in N.J.S.A. 9:6-8.21(c)(4)(b) and, thus, the father abused or neglected his children. The court credited Nate's statement to the investigator and, implicitly, discredited Natalie's statement nothing occurred between her parents during the course of the subject evening. The court noted:

> [Nate] indicated his father choked his mother. It was a physical altercation. [Nate] was frightened. He tried to call the police. He tried to intervene. He and his sister tried to break up the fight, and he said his sister got hurt.
>
> We don't have any proof that the sister was actually injured; but, they were both present, in close proximity. Both tried to intervene, and pull their father off their mother. The – this was – was corroborated by the caseworker who observed the red mark on the mother's neck.

A-3368-16T4

The court acknowledged the father disputed the claim that he choked the mother, but the court placed weight on the fact Nate's claim the father choked his mother and caused bruising on her neck was corroborated by the marks the investigator saw on the mother's neck. We also note here that, even though the father disputes he choked the mother, he does not dispute he grabbed her around the neck or grabbed her collar.

On the basis of its factual findings, the court concluded the Division met its burden of proof because, when the children saw their father choking their mother, they were incited to do what they could to rescue her and attempted to pull their father off their mother. Thus, their father's conduct induced the children to come within close proximity to him while he was injuring their mother, which placed the children at substantial risk of becoming physically harmed. The court noted it was not making a finding the children were psychologically harmed, because there was no evidence from an expert establishing the children sustained any emotional or psychological injury.

## II

On appeal, the father contends that: (1) the trial court's finding he committed an act of abuse or neglect is not supported by a preponderance of the evidence; (2) the Division failed to prove he did not exercise a minimum

degree of care; and (3) the Division failed to prove he placed the children at substantial risk of harm. We disagree with these contentions and affirm.

An "abused or neglected child" as defined in N.J.S.A. 9:6-8.21(c)(4)(b) includes one whose parent places such child's physical condition "in imminent danger of becoming impaired as the result of the failure of his parent . . . to exercise a minimum degree of care . . . by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof[.]"  (emphasis added).

"[T]he phrase 'minimum degree of care' refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." G.S. v. Dep't of Human Servs., 157 N.J. 161, 178 (1999). Although the distinction from ordinary negligence cannot be precisely defined, McLaughlin v. Rova Farms, Inc., 56 N.J. 288, 305-06 (1970), the essence of gross or wanton negligence is that it "implies that a person has acted with reckless disregard for the safety of others." G.S., 157 N.J. at 179. Certainly, "a guardian fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and . . . recklessly creates a risk of serious injury to that child." Id. at 181.

"[W]hether the actor actually recognizes the dangerous character of her conduct is irrelevant[,]" and "[k]nowledge will be imputed to the actor." Id.

A-3368-16T4

at 178. Such knowledge is imputed "[w]here an ordinary reasonable person would understand that a situation poses dangerous risks and acts without regard for the potentially serious consequences[.]" Id. at 179. Therefore, "a person is liable for the foreseeable consequences of her actions, regardless of whether she actually intended to cause injury." Ibid.

"Whether a parent or guardian has failed to exercise a minimum degree of care" in protecting a child is determined on a case-by-case basis and "analyzed in light of the dangers and risks associated with the situation." Id. at 181-82. A finding of abuse or neglect is to be based on a preponderance of the evidence. N.J.S.A. 9:6-8.46(b)(1). The Division need only show it was more likely than not the defendant abused or neglected the child. See N.J. Div. of Youth & Fam. Servs. v. N.S., 412 N.J. Super 593, 615 (App. Div. 2010); N.J. Div. of Child Prot. & Permanency v. J.L.G., 450 N.J. Super. 113, 119 (App. Div. 2015).

Appellate review of a Family Part court's factual findings is limited. N.J. Div. of Child Prot. & Permanency v. K.F., 444 N.J. Super. 191, 200 (App. Div. 2016). We must uphold such findings if they are supported by "adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). Any "alleged error in the trial judge's evaluation of the underlying

8

facts and the implications to be drawn therefrom," are reviewed to determine only if the errors were "so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 189 (App. Div. 1993)).

We also recognize the special expertise of the Family Part court. Cesare, 154 N.J. at 412-13. The judgment of a trial court in a family-related matter "should not be overthrown except upon the basis of a carefully reasoned and factually supported . . . determination, after canvassing the record and weighing the evidence, that the continued viability of the judgment would constitute a manifest denial of justice." In re Adoption of a Child by P.F.R., 308 N.J. Super. 250, 255 (App. Div. 1998) (quoting Baxter v. Fairmont Food Co., 74 N.J. 588, 597-98 (1977)).

Applying these legal principals, we are satisfied the court did not err in the manner the father contends, because there was a preponderance of evidence the father abused or neglected Nate and Natalie as defined by N.J.S.A. 9:6-8.21(c)(4)(b). The court considered the statements the parents and the children provided to the investigator, which were admitted in evidence without

9

objection, but ultimately placed weight upon the mother's and, in particular, Nate's statement, to arrive at its conclusions.

We are mindful that, while admissible, a child's statement relating to allegations of abuse or neglect may not be used to make a finding of abuse or neglect unless such statement is corroborated.  N.J.S.A. 9:6-8.46(a)(4).  However, corroborative evidence "need only provide support" for the child's out-of-court statement, and may be direct or circumstantial.  N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 521-22 (App. Div. 2017) (quoting N.J. Div. of Youth & Fam. Servs. v. L.A., 357 N.J. Super. 155, 166 (App. Div. 2003)).

Here, Nate reported to the investigator that he saw his father choking his mother and that such act caused bruises to form on his mother's neck.  The investigator testified she actually saw red marks on the mother's neck, but we are satisfied the marks the investigator observed corroborate Nate's statement he saw the father injure the mother in the manner both he and the mother reported.  Whether described as bruising or red marks is inconsequential; the fact is the mother had discoloration on her neck following the incident, which was observed by the investigator.  Further, the father did not deny there was such discoloration following the incident.

In addition, although he denied choking her, the father admitted he grabbed the mother by the neck or by the collar.[2] In our view, whether the father grabbed the mother by the collar or neck or went so far as to choke her is immaterial. Either one of these acts would have appeared as though the father were hurting the mother. It was foreseeable the children would have been frightened and highly concerned about their mother's welfare, and would have responded by trying to keep the father from inflicting further injury upon her.

By provoking the children into helping their mother, the father placed them at substantial risk of injury by drawing them into an area where acts of violence were taking place. Without question, the father knew or should have known of the dangers inherent in his actions. He failed to exercise a minimum degree of care and recklessly created a risk of serious injury to the children. See G.S., 157 N.J. at 181. Whether the children were injured is immaterial. The fact the father put the children in a position where they were placed at

---

[2] Although the father initially claimed he grabbed the mother because she punched him, suggesting his actions were undertaken in self-defense, he later stated he grabbed the mother because she "got into [the father's] face" and that the mother did not punch him until after he left the house.

A-3368-16T4

substantial risk of being injured was sufficient to find he abused or neglected them pursuant to N.J.S.A. 9:6-8.21(c)(4)(b).

We understand Natalie denied there was any incident at all; however, by crediting Nate's statement, the court clearly rejected Natalie's. Further, it is significant the father himself does not dispute there was an incident, during which he grabbed the mother's neck or collar.

In summary, there was ample evidence in the record for the court to accept and base its legal conclusions upon Nate's account of what occurred. The trial court's conclusion the father abused or neglected the children is supported by credible evidence and is in accord with the controlling legal principles.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3368-16T4